Thank you, Chief. If it pleases the Court, my name is Mike Ingersoll and I'm here on behalf of Travis Short, Kyle Gabby, and Jeremiah Harrelson in their individual capacities. Defendants appeal from the District Court's denial of qualified immunity and specifically for the purposes of this appeal because of its interlocutory posture. We accept the facts as the District Court gave them to us. However, under that view of the facts, it is our position that the law was not clearly established. At the time, which was February 28, 2019, that removing Ms. Martin from her vehicle with no significant injuries whatsoever after she failed to stop for Travis Short despite being signaled with lights and sirens for approximately six miles, driving oddly, reducing her speed in the 65 mph zone to 30 mph at night and in the pouring rain, missing two exits before finally pulling over on the third, and then once stopped, did not comply with commands to show her hands, exit the vehicle, or lower a window. That removing her through breaking the window of her driver's side, pulling her from it, and handcuffing her all in mere seconds with no injuries did not violate her constitutional rights and the law was not clearly established that it would. That's a lot of facts. And while at the summary judgment stage we obviously have to take those facts in the light most favorable to Ms. Martin, for the qualified immunity analysis we need to view it from the officer's perspective at the time. It was a rainy night, wasn't it? I believe his plaintiff described it as raining cats and dogs, Your Honor. How could you expect the driver to pull over? She was signaled, I believe the total distance was about 5.7 miles. She passed two exits that were unobstructed off of the highway. It wasn't a chase. She wasn't running from you. Well, Your Honor, I think Ms. Martin would say she slowed down, right? She slowed down to 30 miles per hour in a 60 mile per hour zone. And I think to orient ourselves here it's important that we look at this from the officer's perspective. And at this point in the interaction it was Travis Short. Travis Short had signaled for her to pull over. She missed two. So even before we get to that, look at it from the officer's perspective. What were the offenses that she was alleged to have committed? Thank you, Your Honor. She was originally signaled, Travis Short signaled her to pull over for not having tags. And earlier in the day she had been pulled over by Montgomery County law enforcement who had seized her tags. Travis Short came upon her around 6.38 in the evening is what the report says. And February 28th, obviously that's dark. He saw she didn't have tags. He pulled her over. Travis Short wasn't deposed, but I believe what he would say is he pulled her over just to see what was going on and give her a warning. Travis Short, Kyle Gaddy, Jeremiah Harrelson, or any of the other individual defendants were not deposed in this case. Only Sheriff Seabolt is in his official capacity. Excuse me. The officers were not threatened in any way here? Well, I think the totality of circumstances would indicate that they were, Judge Wilkinson. If we take this from its beginning through its end, the facts are this. She was signaled to pull over. She didn't. It was night. It was raining. She slowed down to 30 miles per hour in a 60-mile-per-hour, 65-mile-an-hour zone. Missed two opportunities to pull over. How is any of that threatening? What is threatening about that? Again, from the officer's perspective, Travis Short wouldn't know whether she's making a plan, what's going on. And I think that what my friend, Ms. Dant, will get up here and say is that Ms. Martin intended to comply. She intended this. She intended that. And I believe that all that's valid, that Ms. Martin's feelings and her intentions are all valid. But they can't control this analysis. We have to look at the qualified immunity analysis from the officers at the scene. And Travis Short is seeing unusual behavior as she's driving down the highway. He's seeing opportunities for her to pull over, and she's not. He's seeing her slow down her speed significantly. And she's not complying with commands. Wasn't there evidence that this was also a construction zone? There was construction on the highway, but the exits themselves that she missed, that she admitted she missed, were not under construction. You're talking about exits. Was it an interstate highway? It was I-73 running through Asheboro, North Carolina. I-73? Yes, Your Honor. I didn't see that in here. Yeah. It was I-73. She pulled over on exit 71, which is the McDowell Road exit. That was the third exit. Ironically, the sheriff's office sits on that. But I haven't found one where the officers actually took a woman and pulled her through the window of a car in a situation where it was raining and where the shoulders may have been blocked and where there was not a high-speed chase, where there was no threat. Why shouldn't this go before a jury? Well, Your Honor, I think the threat is very important. And that gets to the brim. It's kind of shocking, really. Well, Your Honor, I don't know that it's necessarily shocking. Again, if you look at it from the long view. In many cases, do you know where the driver was pulled through the window of a car? By her hair. Allegedly, Your Honor, yes. Well, we take the facts as they are. No, they broke the window out before they could pull her through. Right. They broke the window out. They pulled her through. They did not use any sort of mechanical force. And what I would say is they actually broke both windows out of the front. They did, Your Honor. Jeremiah Harrelson was on the passenger side. And this is, again, I'll take us now. They stopped the officers who had responded to Travis Short's call for assistance. Again, the Sheriff's Office sits at the top of this Exit 71 where she pulled over. So they're all right there anyway. The officers that had responded, we're talking Gabby Harrelson, Eric Weaver, who was dismissed from this case and actually is the person who broke the window, and Kyle Gabby, all approached with weapons drawn, given the potentially volatile situation. Again, low-speed chase, but still a pursuit, I'll call it. It's not a high-speed chase. It's still a pursuit. And they all had their weapons out. They approached with their duty weapons. For a tag problem. Well, it began as a tag. And this goes to Graham, right? I mentioned the tag. Well, slowing down to 30 was a violation of the law? It was, Your Honor. What was that? That's a – Going too slow? Yes, Your Honor. I wasn't familiar with that. In a 65-mile per hour zone. I practiced law for 30 years, and I've been a judge. I didn't know it would be a violation of the law to slow down. There's a general statute in North Carolina that says if you're doing under 45 in a 65, that I believe is a misdemeanor. But it can be aggravated to a felony. So that was also – So is that the reason, then, that they did all this? Because you're going too slow? Well, so the District Court found a magistrate, Patrick Auld, we elected to use a magistrate in this case. Patrick Auld found that the stop itself was lawful. There's the excessive force that we're here to talk about today. That's all. But I believe it's the totality. In the laboratory appeals, we ask ourselves whether these cases are factually laden, factually disputed, or whether there's some error of law committed. This seems to me a factually heavy case, and it sort of is a textbook example of something that should go before a jury. Because what is the issue of law that is before us to correct? But there are many issues of fact that a jury would benefit from seeing. I understand, Your Honor. The issue of law is whether the law itself is clearly established. Tee up the legal issue for me if you think there is one. Whether the law was clearly established as of February 28, 2019, that under these circumstances, they would have violated her rights. And I believe, Your Honor, they take position that there's no jurisdiction. There is a jurisdictional. There was a motion dismissed for jurisdiction. It was brought up again in Ms. Dan's response brief. Yes, Your Honor. That there's no jurisdiction. This is that Mitchell v. Forsythe interlocutory appeal. Your Honor, yes. We don't dispute the facts as the district court gave them to us. We accept them. It's a factual dispute. Well, there are factual disputes. That's what Judge Ault said. Lots of factual disputes, and we're going to have to have a trial. Well, Your Honor, I will point you to our reply brief. Beginning at page 5, we discussed the Winfield case. And actually, I believe, Judge Wilkinson, this was your concurrence. It was quoted in Cooper v. Sheehan, 735 F3rd 153, page 157, 2013 decision out of this court. The block quote there includes, I believe, Judge Wilkinson, your concurrence from the Winfield v. Bass case, which is 106 F3rd 525. Indeed, if this central question, whether given facts show a violation of established law, is not subject to immediate appeal, a public official's right to appeal denials of qualified immunity will be less than of little worth. And what they're talking about in that block quote from the Cooper case is that it begins, inasmuch as every denial of summary judgment by definition involves a determination that the evidence is sufficiently disputed to raise tribal issues, the mere existence of disputed facts, even critical ones, does not deprive us of jurisdiction, citing the Winfield case. So, you know, I don't disagree with you that if you're willing to accept the facts as the magistrate found them, that we can decide, as a matter of law, whether on these facts the law was clearly established or not, that these officers could do what they are alleged to have done. But you say that, but then you quarrel with some of the facts. For example, you say that it's disputed whether or not she put her hands up. Well, she says she did, so if she says that, we have to accept that as true. Now, you say that the officers perceived that perhaps she was engaged in an aggravated form of an offense, a traffic stop, but I suppose that's also disputed. We don't know. We can't accept the officer's rendition of that. So are you really willing to accept all of the facts? Because if you're not, then we have to sort of stop right there. No, Chief, we do accept the facts. And what I will say is that all of those facts are correct. The district court recited those. And even taking the hands, you know, put your hands up, that command, in a light most favorable to her, and as the district court found, Ms. Martin says she put her hands up. She did not comply with the other commands that were given to her that were clear and concise, to exit the vehicle or roll down the window. Because she couldn't. She couldn't get out of the vehicle. The window wouldn't roll down, and you wanted her to keep her hands in sight, and the door wouldn't open. Well, Ms. Martin admitted in her deposition. There's only one way to get in. She had to get in the back seat of the car and crawl over the seat to drive the car. Well, and Ms. Martin admitted in her deposition. And the district court found that the officers would not have known any of that. So from their perspective, they would not have known that she was telling the truth when they asked, again, crediting her statements and crediting the district court's facts, that when asked or ordered to roll down the window or separately later to open the door, she says in response, I can't do that. They don't know her. They've never met Ms. Martin. And she admits that in her deposition also, that they don't know her from Eve. So they don't know that she's telling the truth. This is a situation that began as a very minor offense and then quickly transformed into something else. You're talking about your facts rather than hers. Well, Your Honor, we do have to look at it from the law enforcement officer's perspective. You have to accept the facts in the light most favorable to her. We do, but for the qualified immunity analysis, we also have to give some credit to the law enforcement officer's perspective. You've established something. You've got to take the facts in the light most favorable to her. On summary judgment, Your Honor, yes. But, again, for qualified immunity. So the question is then, I'm assuming that's what she said. Yes, Your Honor. She couldn't get out of the car because, you know, I learned a new term in this case. It's a hooptie. I said hooptie and I was corrected during our discussions of this case, but it's apparently. I grew up in Mint Hill, North Carolina. There were a lot of hoopties running around. Okay. So I didn't grow up in that environment. Although, ironically, I think I owned a hooptie car when I was in law school, but I digress. So if you accept her statements that she said she couldn't get out of the car, isn't it a jury question whether or not the officers acted reasonably in response to those contentions? And back to Judge Wilkinson's point, is it reasonable in response to those contentions to break open both the car window and the car door and literally yank this woman out by her hair through the window? Isn't that a jury question? Her hair and her arms. We don't know the extent to which she was pulled out by her hair. Well, that's what you said. You said her hair, right? Yes, Your Honor. So the answer is. What she said you have to take and accept is true. Yes, Your Honor. And under those facts, we believe the law was not clearly established on February 28, 2019, that that would violate her rights. And the best case for that is actually a decision that came out between our opening and our reply brief, the Omish v. Kincaid case from this court, which is a 3-0 published decision. I believe it was Judges Niemeyer, Thacker, and Benjamin. And I will give you the cite. That is 846, or sorry, 86F4-546. Okay, but the trouble is when we have a woman who, it's a rainy night, shoulders are blocked, woman's driving 40 miles under the speed limit, her hazard lights were on, and as I mentioned, the shoulder's blocked. We can't, there's no threat, no discernible threat to the police. We can't just have officers running around and breaking windows and yanking people and pulling them through the window of a car. I mean, that is just, to the extent that something is clearly established, it would seem to me to be clearly established that no, you should not be doing this. This is not acceptable police behavior, or at least a jury could see it that way. You know, I'm not saying that you wouldn't prevail before a jury. I have my doubts, but you're fine. But this is not, this is suggesting this may not be a case you're going to want to take before a jury if you're presented the way to avoid that, because I can think of a lot of jurors that would be sitting and saying, wait a minute, I don't want this happening to me. That's what jurors are going to say. They're going to say, what? I don't want this happening to me. I don't want officers pulling me, breaking my car window and pulling me through the window of a car. That's one of the great things about a jury trial. The jurors can apply their good common sense. So you might just want to reflect on that. Yes, Your Honor, and I see my time is out, but if I could just briefly address that point. I believe that what we look at in terms of whether the law was clearly established is whether the law was established such that it put the officer's conduct and the lawfulness or the unlawfulness of it beyond debate, that they transgressed a bright line. And what Omish says is that as of March 5th, 2019, five days after this happened, that as of March 5th, 2019, it was not clearly established in this circuit that using pepper spray to remove a motorist who was initially pulled over for a minor traffic infraction, in that case it was running a red light, who did not comply with commands. Again, the district court found, and we said in our brief, that she did not refuse. But refusal and noncompliance leads to the same result. She wasn't complying, and the officers don't know her reasons for that. They just know that she's not complying with clear commands. Omish says that as of March 5th, 2019, despite giving clear commands, a motorist refusing those clear commands, which started as show me your license and registration in that case, and became exit the vehicle. The plaintiff, Ms. Omish, did not exit the vehicle, refused repeated commands. The officer eventually had to deploy pepper spray in order to get her to comply. He removed her from her seatbelt, as was happened here. Travis Short reached in, cut the seatbelt, did not rip her through it, but plaintiff's own evidence shows that the seatbelt was cut, clearly cut. Pulled through the window. Omish, we're not sure how she was removed from the vehicle, whether it was through an open door or through the window, but we know that the officer had to reach in, spray her with pepper spray at her forehead, at her hairline, and then physically remove her in order to secure her. That case was slightly different. The main difference there was that that stop happened on the side of the highway with busy traffic behind him, but this happened on, albeit on an exit, in the night, in the pouring rain, low visibility after all of the circumstances that had just preceded it, which was the chase and the repeated refusal to obey commands. And when her window was broken, Eric Weaver, who again was dismissed from this case, gave her a warning and said, well, then cover your face, and the district court acknowledges this in its order, well, then cover your face because I'm going to bust the window out. District court quotes that. So she was given a warning, three hits with an ASP, a baton, then broke the window. Her seatbelt was then cut. She was brought out. What Omish says is that five days after this case that we're here for today, it was not clearly established that using pepper spray, mechanical force, to remove a motorist under very similar conditions would violate that motorist's rights. So these officers were not on notice as of February 28, 2019, that the minimal force used, which again resulted in no injuries, she got a Band-Aid and ibuprofen days later because she sought no medical help on the scene. Minimal force? They broke the window and pulled her out by her hair. Your Honor, there were three different things. You're going to argue to the jury that's minimal force. Well, again, the Supreme Court has rejected, and we acknowledge this in our brief, the Supreme Court has rejected that there is a rule that de minimis injuries means no excessive force, but what the Supreme Court in this circuit has also said is that it does indicate at least the level of force that was used, and we have to look at the Graham analysis, which is the excessive force analysis. We have to look at that with an eye towards proportionality. That's a framework. It's not three mandatory exhaustive factors, and Graham says that. It's a framework. So with an eye towards proportionality, you know, we would ask the district court order to be reversed on qualified immunity. All right. I apologize for going over. Thank you, Mr. Ingersoll. Ms. Stant? May it please the court. Good morning, Your Honors. My name is Taylor Dant. I represent appellee Ms. Kayla Martin. We agree with Your Honors. There is no argument that force was not used against my client. My argument is going to be short as it comes to the law. As the brief states, we're arguing that this court does not have jurisdiction to hear this appeal, and that's simply because while the appellants are stating that they agree with the facts, it's essentially that they're retrying the case on appeal. That's appellee's position. Hunter states that if an appeal is solely on an issue of material fact, then the Fourth Circuit loses jurisdiction. Excuse me. I'm not sure that the timer is on. I apologize. I did not know that. No. There it is. Now it is. You can start all over again. We're just arguing that this court does not have jurisdiction, although we are humbled and honored to be here because when I was listening in court earlier, I think that this court has the inherent authority to correct issues on record. I want to talk a bit about my client. She was not only pulled by her natural hair. She was pulled by her arm with enough force that these three grown male officers ripped her small frame body through the seatbelt. We have put evidence on the record that essentially there was no seatbelt cut, but it was enough force. She was ripped through the seatbelt, through the broken glass of her hoopty, which that was a new term for me as well, but that car was a hoopty. Driving a hoopty is not illegal. Getting in a hoopty in the back passenger door is not illegal. Her license plate had been seized moments prior by a county prior to Randolph County where she was stopped.  He let her exit the vehicle. He seized her tag. That is what a reasonable officer acts like. I do have a question about the extended time that your client took to pull over, and I get that it was raining and there was a construction site, but six and a half miles I think would get an officer's attention. Don't you think that something might be amiss? I agree with you, Your Honor, and I think that my opposing counsel, they're amazing attorneys, and the framing of it looks awful, but that's an issue for the jury. It's 5.7 miles, and when she first missed that first exit, he had immediately just started pulling her. The next exits are on this interstate, not exiting the interstate. They're going to other areas, and I can't remember where they're going because I do not travel there much myself. She pulled off on the first available exit off of the interstate where she knew she was exiting the interstate and not going some other direction in North Carolina. Additionally, when she was first stopped, it was an active construction zone, and the orange cones were all alongside of the highway. When she was first stopped or when they first? When they first signaled their lights to pull her. When they first signaled it, she couldn't get off on the berm. Yes, Your Honor. Is that what you're saying? Yes, Your Honor. Is she northbound or southbound? I would have to look at the computer. Which direction is she going? I said that highway goes north to Greensboro, right? Yes. I believe she was northbound. I do believe so. She had her hazard lights on? Yes, sir. She had her hazard lights on, and she was traveling under the speed limit, which at that time, in the brief of appellants, they stated 70 miles per hour, but if it's a work zone, it's 55 miles per hour. And so she was around 48 miles per hour the second that the sirens turned on. She slowed down. And it reflects that, that she went from 48 all the way down to, I believe, 31 miles per hour. You can also see in the exhibits on the record that a communicated aid dispatch was indicating she was raising her arm up and down. She was indicating a reasonable officer would know that she was stopping. At what point did she turn her hazard lights on? I believe she turned her hazard lights on when she missed the first exit. So when the lights turned on, she had just passed the first exit, and as the record reflects in deposition, she stated, I didn't realize that the exit was right there because it was raining, it was dark. Did she stop at the second exit or the third exit? I believe it would be the fourth exit, if I'm being completely honest. She passed three exits and then stopped. Technically, yes. On the exit ramp? Yes, because the first exit, I believe, is when he started signaling his lights. And so she's driving by the first exit, and if he had turned on his lights, she would have been immediately able to get off, in our belief and in our opinion, if it wasn't raining, if it wasn't as dark, and she could see better. Then we enter the construction zone, and then we have the two exits that are not exits off of the interstate, immediate exits off of the interstate. So technically, if she would have taken either two of those, our position is she would have been traveling farther because she wouldn't know when the next exit is. See, that's one of the things that my good colleague Judge King brings up.  She can explain why she bypassed those exits, and the jury can hear her explanation, and then the jury can hear the officer's perception. But the whole idea of passing the exits and why the exits were passed and what the conditions were and what the exits looked like and what her frame of mind was and what the officer's perception was, this is the case. The case just cries out for a jury. It just does. We agree. We absolutely agree. And to your point, Judge Ault stated that the material facts were the severity of the crime. So we're stating it's a crime, but was it a crime or an infraction? Because fleeing to elude, you cannot have a fleeing to elude charge if you're not being stopped for a crime. So was she being stopped for a crime or an infraction? The law is at issue in front of a jury as well. Their consideration of the fleeing to elude is for their consideration as well. Misdemeanor felony, it all goes to whether or not these officers acted reasonable. Additionally, whether she fled, like Your Honor stated. Also, if she posed an immediate risk. And I do believe that this case shows time after time after time after time she was not an immediate risk to these officers. But one interesting part of being able to argue today is to state that this gives us a chance to look at the reasonableness standard in effect that the surviving defendants, Short, Harrelson, and Gabby, only survived in their individual capacity. But we're arguing a reasonableness standard. And to my understanding and belief, an individual capacity, as opposed to an official capacity claim, is an officer that's acting outside of the scope of a reasonable standard. So I do believe that we're here in an attempt to hash out this case further. I do believe Judge Auld's decision as it pertains to Short, Harrelson, and Gabby with the individual capacity claims should remain. What do you want us to do with this case right now? Right now? Do you want us to affirm Judge Auld or dismiss the appeal? I would like the court to affirm Judge Auld. I also would like the court to exercise Well, you say you filed a brief because there's no jurisdiction. That's true, Your Honor. You're abandoning that? I'm sorry? Are you abandoning that position? I'm Do you want us to affirm him? The reason, to state candidly, the reason I'm stating that I would like this court to affirm the decision is I would, I do believe, as discussed earlier, this court has the inherent authority to Either way, the outcome is going to be the same, isn't it? I do believe that's correct. Dismiss the appeal. I have the same question Judge King did. I'm inclined to, I don't know, you could go either route, but it's going to end up all roguishly to Rome here. That's exactly true, Your Honor. Yes, and I mean, I stayed at 20 minutes because it's my first time arguing in this court. But unless there's any questions, I think my final point is I was listening to oral arguments. And Your Honor, Judge Wilkinson, you were, in 2015, you asked in an excessive force case, you asked the attorney, what would you have done? And if I was the officer, if I was pulling over my client in these conditions, I would have, my first thought would not have been that I'm in immediate danger. My first thought would be, this woman is slowing down. She has her hazard lights on. From my training and experience, I believe she's signaling that she's trying to stop. Is she okay? That would be my first thought as a law enforcement officer, not to call in backup, have all deputies approach, and then have my client beaten for not having a license plate. Your colleague on the other side ended his argument with a citation to the Omesh case where we determined that it was not clearly established that an officer couldn't use pepper spray to remove a woman who was passively resisting from a car, and says that this case is sufficiently on all fours to suggest that the officer wouldn't have been on notice that they were violating the law. Why isn't that dispositive here?  With our case here, the officers are arguing they were not on notice, but the facts tend to dispute that. As the officers in the brief are stating that they had no notice that my client could not open any of the doors of her vehicle while they had an officer in the back door that did open. So I believe that with this case, there are multiple officers who show that my client could not exit that vehicle and was not intentionally avoiding arrest. She physically could not open the door or roll down the windows. And I think that here, if in this case, it was not my client's person that was avoiding an arrest. It was the car she was in. And her constitutional right is to be secure in her place as persons things. Sometimes it's a good question. Sometimes I ask myself, why is something not clearly established? And sometimes the answer to that question is because it's genuinely hard. It's a genuinely hard case. But at other times, the answer to that question is it's not clearly established because the behavior is sufficiently offensive that it doesn't occur enough for the law to become clearly established. Now, so the point is it can fall into one of two categories as to why something is not clearly established. And it seems to me this may likely fall into this latter category, which it isn't clearly established because the behavior is sufficiently outrageous that officers don't indulge in it with sufficient frequency for the courts to say no. And to clearly establish that it's not permissible. But that's maybe a reason it's not clearly established. And the reason need not be particularly flattering to the officers in this case.  It's our position that what happened to my client was abhorrent. No reasonable officer should ever act this way. I still drive a hoopty. And so if I leave court and if anything were wrong with my license plate, then are we really okay with arguing that this behavior is reasonable? Now, your friend there, colleague, argued that your client wasn't hurt. Even though she was pulled out through the window by her hair. I assume you're alleging in the complaint that she suffered what we used to call pain and suffering? Yes, Your Honor. And aggravation and things like that? Yes, Your Honor. And that's been a contention throughout this case that my client was not hurt. These were three grown men that pulled her natural hair, her left arm with enough force, like I stated earlier, to rip her through the seat belt. And we have evidence, medical records, everything of that nature that tend to show internal bruising. A significant amount of internal bruising when she went to the hospital. She also has mental health issues right after this. She has trouble driving past Randolph at all. She refuses to work in any capacity in that county. She's been diagnosed with post-traumatic stress disorder. She's suffered tremendously from the actions of these officers. And she's somebody who this case was about having her voice heard and for accountability. Because she does not want this to ever happen to anybody else. And if she had acted in any manner differently, and I don't know if I would have been able to, if she had not put her hands, as she stated, given to the court. In fact, she put them on the window because she said, I don't know if you've noticed, I'm black. And she put her hands on the window because she said she was not moving. With all these officers, with their guns drawn to her. Had she tried to get out of the vehicle like the officers were demanding, that would have meant reaching down, unbuckling her seat belt, and moving. And I have no doubt that she would have been shot. So, to answer that question, back to Judge Wilkinson's question, what would you have done if she had acted in any manner differently? I do not believe she would be alive today. We might have a wrongful death suit, except for her voice would have never been heard. Because she's been fighting for accountability since 2019. And unless there are any other questions, that concludes my argument. Thank you, Ms. Dann. Thank you, Your Honor. Mr. Ingersoll, you've got some rebuttal. Yes, Your Honor, briefly. Thank you. I think I can address these points fairly quickly, but there are a number of inaccuracies that were just presented. First, I'll begin sort of working backwards. Judge King, to your point about emotional distress damages, there is zero evidence of that in the record, and we sought it in discovery and almost had to file a motion to compel. We eventually did get medical records long after the close of discovery. We held a second deposition of Ms. Martin, which we have excerpts of attached to our summary judgment motion, which is in the record discussing those damages. All we got were some physical therapy records. And when she went to the ER a few days later and got a Band-Aid and ibuprofen. In terms of internal bruising, we have no records of that. There's none of that in the written record that we have, and it's the first we're hearing of it. In terms of Ms. Dann said that Ms. Martin did not choose the exit that she got off of. I'm sorry. She said that Ms. Martin chose the exit that she got off of. That's not what Ms. Martin said. Joint appendix, page 214 to 215, Ms. Martin was very clear that she missed the exits in account of the rain and because it was dark. She said she couldn't see them, but they weren't obstructed. She also admitted that. She just missed them because of the rain. In terms of the seat belt. So she got off at the first one that she thought she could get off on. She missed them because of the rain. Well, Your Honor, again, law enforcement officer's perspective. Did she say that it hurt when they pulled her out by her hair? I just can't imagine that you pull somebody, move somebody through a window of a car by their hair, that it wouldn't be painful and wouldn't cause bad dreams. There could be all kinds of after effects of that. That may be true, but Your Honor, the post-traumatic stress disorder. Well, you're lucky that she wasn't hurt physically by a lot of things, I suspect. Well, I think that she wasn't hurt physically because of the conduct of the officers. This was, to put this in context, the timing of this was very quick. Jeremiah Harrelson was on the passenger side of this Toyota Corolla. We're not talking about a Ford F-250. We're not even talking about a Dodge Caravan minivan. We're talking about a short, snub-nosed Toyota Corolla. Jeremiah Harrelson was on, if you read his report, which the district court relied upon, Jeremiah Harrelson was on the passenger side, and by the time he got to the driver's side, he realizes she's being pulled through the window. By the time he gets to the driver's side, she's already in handcuffs and on her feet. It's over. And she had no injuries whatsoever. In terms of the emotional distress damages, again, we have no evidence of that. And the PTSD diagnosis, again, this is the first we're hearing of that, and we have no medical records of that either. What you just said sounds like a fine jury argument. I mean, I was just thinking that, you know, it's a good jury argument, but not necessarily something that, you know, it doesn't have that kind of an appellate character. Because what you just said in talking about this fact and that fact and the explanation of it, that has the tenor of a jury argument, not an appellate argument. That's all I'm saying. And I understand your point, Your Honor. I think, again, and I've harped on it repeatedly, the qualified immunity analysis is different than the general excessive force analysis. Qualified immunity looks to or looks at it from the perspective of the officers at the time. She was not beaten. She wasn't abused. She wasn't cursed at. She had no injuries. So while, again, the Supreme Court has rejected a rule that de minimis injuries mean no excessive force, this circuit and the Supreme Court have said that it does indicate that the force may have been reasonable. I think maybe this is a point that Judge King has raised. She wasn't beaten or anything, but pulling a woman through a car window that she had just broken, she could have been badly cut. But she wasn't, Your Honor. The medical records reveal that she wasn't. Well, you and your cons were lucky that she wasn't. And she suffered pain from the pulling on her hair. I can concede that she may have suffered pain from her hair being pulled. Weapons were holstered at the point that the driver... I want a majority on that. Well, the weapons were holstered at the point that Weaver and Short were at the driver's side window. So she was not pulled out under duress of weapons being drawn on her. They had been holstered. And I guess the prevailing question here that I haven't heard asked but that I can't seem to escape is, under these circumstances, what was the alternative? They don't know, and that may seem callous, and I don't mean for it to sound that way, but at night in the rain after she had refused to stop for almost six miles, she hadn't obeyed any commands, she wasn't rolling down the window, she wasn't exiting the vehicle. They didn't know anything about this woman. They have no idea who she is. She seems like a perfectly fine and nice person to me. Maybe they need a longer conversation and find out why the window wouldn't come down or the doors wouldn't open. She could have explained to them, they don't work. They don't work. The doors don't work. The windows don't work. I had to crawl in the back door. And that is fair. And that alternative would be that the officers have to accept the stranger at her word after the totality of facts. I will say that this began, like Omish, as a minor traffic infraction, and it quickly became something else. And that is under the gram factors, the severity of the crime, that's the tone and tenor of what we have here. Those are the circumstances. I will also mention that Short initiated his lights after seeing her with no tags. It wasn't after she missed the exit. That's at Joint Appendix 559 to 560. And the last appendix site I will give you is, and I apologize if I've already done this, but plaintiff's own evidence regarding the seatbelt shows that it was cut. That's at Joint Appendix 155. That's plaintiff's own evidence. She attached that to both her complaint and her motion for summary judgment. Those are the records that we turned over pursuant to a public records request. And the seatbelt was, you pulled her through the seatbelt. You broke the seatbelt. According to your colleague there. According to her, but not the district court. And her own evidence shows that the seatbelt was cut. If you go look at Joint Appendix 155, it's fairly clear that that's a cut seatbelt, not a ripped one. And with that, your honors, again, I'll ask that the district court's decision on qualified immunity be reversed. And if there are no further questions, I'll sit down. All right. Thank you, Mr. Ingersoll. We'll come down and greet counsel and move on to our final case.
judges: Albert Diaz, J. Harvie Wilkinson III, Robert B. King